[Cite as *In re C.D.G.*, 2020-Ohio-2959.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

|                                              |   |                                      |
|----------------------------------------------|---|--------------------------------------|
|                                              | : |                                      |
|                                              | : |                                      |
|                                              | : |                                      |
| IN THE MATTER OF THE ADOPTION                | : | Appellate Case Nos. 28664 & 28665    |
| OF: C.D.G. & N.A.G.                          | : |                                      |
|                                              | : | Trial Court Case Nos. 2019-ADP-50    |
|                                              | : | 2019-ADP-51                          |
|                                              | : |                                      |
|                                              | : | (Appeal from Common Pleas            |
|                                              | : | Court - Probate Division)            |
|                                              | : |                                      |

. . . . . . . . . . .

O P I N I O N

Rendered on the 15th day of May, 2020.

. . . . . . . . . . .

JON PAUL RION, Atty. Reg. No. 0067020 & CATHERINE H. BREAULT, Atty. Reg. No. 0098433, 130 West Second Street, Suite 2150, Dayton, Ohio 45402
    Attorneys for Appellant, D.M.

CYNTHIA WESTWOOD, Atty. Reg. No. 0079435, 1 South Main Street, Suite 1300, Dayton, Ohio 45402
    Attorney for Appellee, E.M.

. . . . . . . . . . . .

HALL, J.

{¶ 1} Father appeals from the trial court's judgment entry finding that his consent to the adoption of his children was not required because he had failed, without justifiable cause, to have more than de minimis contact with them or to provide for their maintenance and support for at least one year prior to the filing of an adoption petition.[1]

{¶ 2} In his sole assignment of error, Father contends the trial court erred in finding that he lacked justifiable cause for failing to support or to have more than de minimis contact with his children.

{¶ 3} The record reflects that Father, who resides in California, is the biological father of the two children at issue. In late 2016, the children's Mother moved with them from California to Ohio. She later married a man named E.G. ("Stepfather") in November 2017. On May 6, 2019, Stepfather filed a petition in Montgomery County Probate Court seeking to adopt the two children. Father objected to the petition. The matter proceeded to an October 28, 2019 hearing before the trial court. Witnesses at the hearing included Father, Mother, the children's maternal grandmother, and the children's paternal grandmother. The sole contested issue at the hearing was whether Father's consent to adoption was not required under R.C. 3107.07(A) because he had failed, without justifiable cause, to have more than de minimis contact with the children or to provide for their maintenance and support for at least one year immediately preceding the filing of

---

[1] The present case actually involves two consolidated appeals by Father. Montgomery App. No. 28664 is Father's appeal from Montgomery P.C. No. 2019-ADP-50, which involved an adoption petition involving one of his children. Montgomery App. No. 28665 is Father's appeal from Montgomery P.C. No. 2019-ADP-51, which involved an adoption petition involving his other child. The two cases were heard together and decided the same day by the trial court.

the petition. Following the hearing, the trial court filed separate judgment entries in which it held that Stepfather had proven by clear and convincing evidence Father's failure to have more than de minimis contact with the two children or to provide maintenance and support for them during the relevant time. The trial court also held that Stepfather had proven by clear and convincing evidence that Father lacked justifiable cause for his failure to have more than de minimis contact with his children or to provide maintenance and support for them. (*See* Dec. 3, 2019 Judgment Entry at 12, 14.)[2] As a result, the trial court held that Father's consent to the adoption of his children by Stepfather was not required. (*Id.* at 14.)

{¶ 4} This court recently set forth the law governing the present appeal in *In re Adoption of J.R.J.*, 2d Dist. Darke No. 2019-CA-12, 2019-Ohio-4701, as follows:

A parent has a fundamental right to care for and have custody of his or her child, and that right is terminated when a child is adopted. *In re Adoption of E.E.R.K.*, 2d Dist. Miami No. 2013 CA 35, 2014-Ohio-1276, ¶ 16. Unless consent is not required under R.C. 3107.07, a petition to adopt a minor may be granted only if written consent to the adoption has been executed by certain parties, including the minor's father. R.C. 3107.06. " 'Any exception to the requirement of parental consent [to adoption] must be strictly construed so as to protect the right of [biological] parents to raise and nurture their children.' " *In re Adoption of M.M.R.*, 2d Dist. Champaign

---

[2] For ease of reference, all citations herein are to the trial court's December 3, 2019 Judgment Entry in Montgomery P.C. No. 2019-ADP-50, which involved one of the two children. We note that the trial court filed a nearly identical December 3, 2019 Judgment Entry in Montgomery P.C. No. 2019-ADP-51, which involved the other child.

No. 2017-CA-12, 2017-Ohio-7222, ¶ 5, quoting *In re Adoption of Schoeppner*, 46 Ohio St.2d 21, 24, 345 N.E.2d 608 (1976) (Other citation omitted.) The party who contends that consent is not required for the adoption has the burden of proof throughout the proceeding. *In re Adoption of M.G.B.E.*, 154 Ohio St.3d 17, 2018-Ohio-1787, 110 N.E.3d 1236, ¶ 38-39, citing *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985), paragraph four of the syllabus.

The exceptions for when parental consent is not required for the adoption of a minor are set forth in R.C. 3107.07. Section (A) of that statute states, in pertinent part, that consent to adoption is not required from the parent of a minor when:

[I]t is alleged in the adoption petition and the court, after proper service of notice and hearing, finds by clear and convincing evidence that the parent has failed without justifiable cause to provide more than de minimis contact with the minor or to provide for the maintenance and support of the minor as required by law or judicial decree for a period of at least one year immediately preceding either the filing of the adoption petition or the placement of the minor in the home of the petitioner.

R.C. 3107.07(A).

When applying R.C. 3107.07(A), probate courts undertake a two-step analysis. "The first step involves deciding a factual question or questions: whether the parent had failed to provide for the support and

maintenance of a minor child or had failed to have more than de minimis contact with the child." *M.M.R.* at ¶ 7. "Probate courts have broad discretion over these factual determinations, which will not be disturbed absent an abuse of discretion." (Citations omitted.) *Id.*

If a probate court finds that a parent failed to provide maintenance and support or failed to have less than [sic] de minimis contact with the child, the court's second step is to determine whether a lack of justifiable cause for the failure has been proven by clear and convincing evidence. "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of [fact] a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

"Once the petitioner has established, by clear and convincing evidence, that the biological parent has failed to communicate with or to support the child for the one-year period, the burden of going forward with evidence shifts to the biological parent to show some facially justifiable cause for the failure." *In re Adoption of R.M.Z.*, 2d Dist. Montgomery No. 23511, 2009-Ohio-5627, ¶ 11, citing *In re Adoption of Bovett*, 33 Ohio St.3d 102, 515 N.E.2d 919 (1987), paragraph two of the syllabus. "The burden of proof, however, remains at all times with the petitioner, who must establish the lack of justifiable cause by clear and convincing evidence." *Id.*, citing

*Bovett.*

"The question of whether justifiable cause * * * has been proven in a particular case is a determination for the probate court and will not be disturbed on appeal unless such determination is against the manifest weight of the evidence." *M.M.R.*, 2d Dist. Champaign No. 2017-CA-12, 2017-Ohio-7222, at ¶ 8; *In re Adoption of Masa*, 23 Ohio St.3d 163, 492 N.E.2d 140 (1986), paragraph two of the syllabus. "In determining whether a judgment is against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact 'clearly lost its way and created such a manifest miscarriage of justice' that there must be a reversal of the judgment and an order for a new trial." *In re Adoption of B.A.H.*, 2d Dist. Greene No. 2012-CA-44, 2012-Ohio-4441, ¶ 21, quoting *Steagall v. Crossman*, 2d Dist. Montgomery No. 20306, 2004-Ohio-4691, ¶ 29.

*Id.* at ¶ 7-13.

{¶ 5} In the present case, Father concedes his failure to have contact with his children and his failure to provide for their maintenance and support during the one-year period immediately preceding Stepfather's adoption petition. Father argues, however, that the trial court erred in finding that Stepfather had proven a lack of justifiable cause on Father's part by clear and convincing evidence. Father insists that Mother significantly interfered with and impeded his ability to contact and support his children. For that reason, Father insists that he did have justifiable cause for failing to have contact with and support

his children during the relevant one-year period.

{¶ 6} Upon review, we note that Father, Mother, and the maternal and paternal grandmothers provided occasionally conflicting testimony regarding Father's efforts to contact his children and Mother's alleged interference with that effort. In its role as trier of fact, the trial court adequately resolved the relevant conflicts through detailed findings of fact, which are supported by testimony presented at the October 28, 2019 hearing.[3] Those factual findings, which we will accept for purposes of our analysis herein, are as follows:

CDM was born on December 30, 2009 in Moreno Valley, California. Father is identified as CDM's legal father on his birth certificate. Mother and Father had an on-again, off-again relationship for several years in California, but were never married. In 2010, Mother and Father travelled to Columbus, Ohio with CDM to visit Mother's family, some of whom had relocated from California, including Maternal Grandmother.

On February 2, 2013, Mother gave birth to a second child * * * ("NAM"). Father is also listed as NAM's legal father on his birth certificate. While Father never established court-ordered parenting time with CDM, Father and Mother lived together with their children at different periods of time at Father's parents' house. In addition, Father continued at times to live with Mother and the children after Mother moved to her own place.

On January 29, 2014, Mother filed a Petition to Establish Parental

---

[3] We note that the trial court's factual findings referred to Father's children by using their initials with his last name (C.D.M. and N.A.M.). The case captions, however, refer to the children by their initials if Stepfather adopted them (C.D.G. and N.A.G.).

Relationship in the Superior Court of California, Riverside County. In the petition, among other things, Mother sought an order from the court granting her joint and physical custody of CDM and [NAM] (collectively, "the children"). Upon Mother's filing of the petition, the court issued a Standard Restraining Order that restrained Mother from removing the children from the State of California without either the signed written consent of Father or the court. The court notified both Mother and Father that the restraining order would remain in effect until judgment was issued, the petition was dismissed, or the court ordered otherwise. Pursuant to an order setting a status conference for November 24, 2014, the court further ordered the parties to file notice with the court of any change in their residence, email address, or telephone number.

Despite Mother filing the petition, Mother and Father renewed their relationship in May 2014. Neither Mother nor Father appeared at the status conference. In addition, Mother did not take any further action with respect to the petition. The petition remained pending in the Superior Court of California until the court eventually dismissed it without prejudice on April 23, 2019 after Mother failed to appear at a hearing scheduled for the same date to show cause for her failure to bring the matter to trial or judgment.

In November 2016 Maternal Grandmother called Father from her cell phone number to notify him that Mother, who was pregnant with her third child, had been hospitalized. [Footnote omitted.] One week later and while still pregnant, Mother departed California with the children and flew to

Columbus, Ohio where they stayed with Maternal Grandmother, who supported Mother and the children for one year. The parties presented conflicting testimony regarding Mother's reasons for travelling to Columbus and the proposed length of her stay. Mother testified that she and Father had a conversation about the two of them moving to Ohio. Paternal Grandmother testified that initially Mother was only supposed to be in Ohio for two weeks to visit Maternal Grandmother for Thanksgiving but later decided to extend her stay over the Christmas holiday. Regardless of the reason, Mother remained in Columbus and never returned to California to live. Prior to Mother's move to Ohio, Father had only seen CDM maybe two or three times during the months of October and November 2016. Father had been living with Mother and the children in a home owned by Maternal Grandmother in Perris, California but moved out of the home in October 2016.

When Mother moved to Ohio, she maintained the same cell phone number she had in California. While Paternal Grandmother communicated with Mother almost every day after she moved to Columbus, Father only called Mother twice and did not send her any text messages during November 2016. Indeed, Father did not call Mother to speak to CDM on Thanksgiving or Christmas in 2016 nor on CDM's birthday on December 30, 2016. He did not send CDM a Christmas or birthday present that year. In contrast, Paternal Grandmother bought winter clothes for CDM and sent them to Mother in December 2016 to an address in Columbus that Mother

provided to her. Moreover, while Father testified that he only spoke to Mother or CDM three or four times by phone or FaceTime chat between November 2016 and March 2017, Paternal Grandmother admitted to having had several phone calls or FaceTime chats with CDM during this same period of time.

Father's last contact with CDM was during a FaceTime chat that Paternal Grandmother initiated on [N.A.M.'s] birthday, February 2, 2017. Mother abruptly terminated this FaceTime chat after becoming upset with Father for telling the children that he was not able to see them. After February 2, 2017, Mother and Father had no further conversations by telephone, and instead communicated by email.

On March 4, 2017, Mother emailed a message to Father indicating that she intended to move on with her life and wanted to know if Father desired to co-parent for the sake of the children. Seven days later, on March 11, 2017, Father responded by email to inform Mother that he had just been released from jail and to ask her if he can have the children's address so he can send them robots and some money. Father also asked Mother for a good time to call. On March 15, 2017, Father sent Mother another email message stating that he has been calling and emailing but has not received a response. The next day, March 16, 2017, Mother responded by indicating in one email that she had changed her phone number because Father failed to call her on March 6 as he had promised. In another email also sent on March 16, 2017, Mother told Father she had nothing more to say to him and

to stop contacting her. Mother further instructed Father to call Maternal Grandmother on Maternal Grandmother's phone on Friday afternoons if he wanted to speak to the children. Mother concluded the email by telling Father to "have a good life."

Upon receiving Mother's email, Father immediately responded that he did not have Maternal Grandmother's phone number. Mother did not reply. When Father asked again for Maternal Grandmother's number on the following day, March 17, 2017, Mother still did not respond. While Mother's cell phone number was disconnected on or about March 16, 2017, her email address did not change. Father never emailed Mother again after March 17, 2017.

In May 2017 Stepfather, who was also living in California where he met Mother, moved to Columbus to live with Mother and the children at Maternal Grandmother's home. In June 2017, they all moved [to] Dayton, Ohio to live together. In connection with the move, Mother completed and submitted a change of address form to the United States Postal Service ("USPS") to have her mail forwarded to her new address.

Sometime after Mother's phone was disconnected in March 2017, Paternal Grandmother and Father located Lisa, a friend of Mother, and asked that she call Mother on their behalf. While Mother did not subsequently call either Paternal Grandmother or Father, Paternal Grandmother did obtain a phone number from Lisa that purportedly belonged to Maternal Grandmother. Despite making approximately twenty

calls to the number Lisa provided to her, Paternal Grandmother never received an answer or a return phone call from Maternal Grandmother or Mother.

Father's additional attempts to locate Mother and the children included seeking assistance from the local police department in California and visiting the last school the children attended before leaving California. Father and Paternal Grandmother also went to Mother's place of employment in California to determine Mother's whereabouts. However, none of these visits resulted in Father or Paternal Grandmother making contact with Mother or the children.

When Father and Paternal Grandmother visited the home Maternal Grandmother owns in Perris, California where Mother last resided before moving to Ohio, they asked the tenant of the home (who is also Mother's relative) to contact Mother on their behalf. However, like before, neither Father nor Paternal Grandmother received a return call from Mother. Paternal Grandmother made several additional trips to Maternal Grandmother's Perris, California home to see if the children might be visiting. Paternal Grandmother, accompanied by Father, made a final unsuccessful stop by the home in December 2018 to see if the children were staying there for the holidays.

(December 3, 2019 Judgment Entry at 2-7.)[4]

---

[4]The findings of fact quoted above are from the trial court's judgment entry in Case No. 2019-ADP-50, which involved child C.D.M. For that reason, the trial court focused on Father's contacts with C.D.M. The trial court made nearly identical findings of fact in Case

**{¶ 7}** After making the foregoing factual findings, the trial court recognized that "a custodial parent's relocation to another state and refusal to provide contact information to both the non-custodial parent and any persons with whom the non-custodial parent is in contact may constitute justifiable cause" for a lack of contact. (*Id.* at 8, citing *Holcomb,* 18 Ohio St.3d 368, 369, 481 N.E.2d 613.)   Although Mother admittedly relocated herself and the children from California to Ohio, the trial court reasoned that she "did not refuse to provide contact information to Father when she relocated." (*Id.* at 9.) The trial court noted that Mother had the same cell phone number from November 2016, when she moved to Ohio, to March 2017, when it was disconnected. (*Id.*) The trial court observed that Father called Mother on her cell phone twice in November 2016 and spoke to Mother or the children a few times by phone or FaceTime chat between November 2016 and March 2017. (*Id.*) The trial court also pointed out that in December 2016 paternal grandmother had sent a package of clothes to a Columbus, Ohio address Mother had provided. The trial court noted that Father never mailed anything to that address. Nor did he attempt to determine or confirm whether it was Mother's address. (*Id.* at 9-10.) The trial court also stated that Father knew Mother had relatives in Columbus but did not try to locate or contact any of them. (*Id.* at 10.)

**{¶ 8}** Even after Mother's cell phone was disconnected in March 2017, the trial court reasoned that Father had other ways to contact her. In particular, the trial court

---

No. 2019-ADP-51, which involved child N.A.G. In that case, the trial court focused on Father's similar contacts with N.A.G. For present purposes, the trial court's factual findings in the two cases were the same in all relevant respects. The factual findings in both cases established that Father had no contact whatsoever with either child during the one year preceding Stepfather's adoption petition. The factual findings in both cases also set forth the same conduct with respect to Father's efforts to establish contact with the children and Mother's actions in response.

pointed out that Mother kept the same email address after March 16, 2017, when she told him not to contact her anymore and to contact maternal grandmother instead. The trial court noted that Father never again emailed Mother after March 17, 2017. (*Id.*)

{¶ 9} Regarding the contact efforts that Father did make, the trial court found that they did not establish justifiable cause for his lack of contact with the children during the one year preceding the adoption petition. In support, the trial court reasoned:

* * * The attempts Father and/or Paternal Grandmother took to locate [the children] included making several visits to Mother's last known California address, which was at a home owned by Maternal Grandmother in Perris, California. However, the evidence demonstrates that Father never searched public records to find out the tax mailing address for Maternal Grandmother's California property. Had Father searched the public records he would have likely discovered Maternal Grandmother's Ohio address since Maternal Grandmother testified that the bills for the California property come to her at the home she owns in Ohio.

Father also testified that he did not have Maternal Grandmother's cell phone number to contact [the children] as Mother had instructed him to do in her final email to Father on March 16, 2017. Father asked Mother more than once to give him Maternal Grandmother's phone number, but she never responded. Mother testified that she ignored Father's request because she thought Father already had Maternal Grandmother's phone number. While it would not have required any effort on Mother's part to give Father Maternal Grandmother's phone number even if she did believe

Father already had it, the evidence nonetheless shows that Father did indeed have or had access to Maternal Grandmother's number, which had not changed in over three years.

Just one week prior to Mother's departure for Columbus, Maternal Grandmother contacted Father from her cell phone to notify him that Mother had been hospitalized. Moreover, Paternal Grandmother testified that she had obtained Maternal Grandmother's cell phone number from "Lisa" and that she and Father had tried unsuccessfully at least twenty times to contact Maternal Grandmother at the number. However, Maternal Grandmother testified that she is not aware of Father or anyone in his family contacting her on her cell phone. While she did recall receiving one phone call from someone calling from Paternal Grandmother's phone, she did not recognize the voice of the person on the other line.

In addition, the evidence demonstrates that Father never attempted to contact Maternal Grandmother via social media despite Maternal Grandmother's testimony that she has a Facebook account and that her page is public. While Paternal Grandmother's testimony revealed that she had communicated with Mother via Instagram, Father never reached out to Mother via her social media.

When Mother moved to Dayton [in] June 2017, she completed and submitted a change of address form to USPS so that her mail could be forwarded to her new address. Accordingly, if Father had taken appropriate steps to locate Mother in Columbus, any correspondence or gifts that he

could have sent for [the children] at Mother's Columbus residence would have subsequently been forwarded to Mother at her Dayton address. Father testified that he took no further action on his own initiative to locate [the children] after March 2017.

Based on the foregoing, the Court finds that Stepfather has met his burden of showing by clear and convincing evidence that Father failed without justifiable cause to prove more than de minimus contact with [the children] for a period of at least one year immediately preceding the filing of the Petition * * * to wit: between May 6, 2018 and May 6, 2019.

(December 3, 2019 Judgment Entry at 10-12.)

{¶ 10} After reviewing the trial court's findings of fact and weighing all the evidence and reasonable inferences, we believe that the trial court reasonably found, by clear and convincing evidence, that Father's failure to contact his children was without justifiable cause. Although Father had established and maintained some degree of a relationship with them in California when he lived with Mother and the children for a period of time, he moved out in October 2016. He then saw the children two or three more times before Mother relocated to Columbus, Ohio a month later to live with maternal grandmother. When Mother moved to Ohio, she did not have her California mail forwarded. (Tr. at 97.) Father had limited contact with Mother or the children in the months immediately following the move. He communicated with Mother and the children only a few times between November 2016 and March 2017. His last communication with the children occurred during a February 2, 2017 FaceTime chat. Father started crying during this conversation claiming he could not be with them. Mother responded by terminating the chat because

she felt it was "inappropriate," testifying that it was her intention to "protect their innocence." (Tr. at 134.)

{¶ 11} On March 4, 2017, Mother emailed Father and asked whether he was interested in a co-parenting relationship with the children. Father did not respond until a week later by email on March 11, 2017, explaining that he had just been released from jail. He asked for the children's address so he could send toy robots and money. He also inquired about a good time to call. Father emailed again on March 15, 2017, stating that he had been calling but had not received a response. The following day, Mother emailed Father, telling him she had changed her phone number, asserting that she had nothing more to say to him, and asking him to stop contacting her. She proposed Father's calling maternal grandmother on "Friday afternoons" if he wanted to speak to the children and advised him to "have a good life." Father immediately responded that he did not have maternal grandmother's phone number. Mother did not respond. Father requested maternal grandmother's phone number again the next day. Mother still did not respond. At that point, Father stopped trying to contact Mother by email.

{¶ 12} Following the foregoing attempts at communication with Mother, Father and paternal grandmother located a friend of Mother's in California named "Lisa." They attempted to establish contact with Mother through Lisa but were unsuccessful. Father and paternal grandmother did obtain from Lisa a telephone number purportedly belonging to maternal grandmother. In its analysis the trial court noted that although paternal grandmother testified that she made approximately twenty calls to that number but never received a response from Mother or maternal grandmother, the court also observed that maternal grandmother testified she only received one phone call from paternal

grandmother's phone number, to which she did not respond because she did not recognize the voice.

{¶ 13} It is apparent to us from the record that it was paternal grandmother, not father, who was the primarily involved in attempting to contact the children.

{¶ 14} The trial court also found, as a factual matter, that Father and paternal grandmother sought assistance from the police department in California, contacted the last school the children attended in California, and visited Mother's last place of employment in California—all in an effort to learn how to contact her and the children. The trial court also found that Father and paternal grandmother contacted the tenant of a home maternal grandmother owned in California and made multiple trips to the home in an effort to get in touch with Mother or the children. We additionally note that Father testified he did not try to find out where Mother was living after March 2017. (Tr. at 174.) He also never searched online. (Tr. at 175.)

{¶ 15} Father does not deny that he had no contact with, and did not provide support for, the children for one year prior to the filing of the petition on May 6, 2019. There is no question that Father had no contact and did not support the children for two years before the petition was filed. Correspondingly, there is no evidence that Mother interfered with or discouraged contact or support during that time. It is Father's contention that the events of March 2017 constituted significant interference and significant discouragement, which justified his lack of contact from May 2018 until May 2019, the one year prior to the filing of the petition. That contention is not contrary to a justifiable cause evaluation allowed by case law. In *Holcomb,* 18 Ohio St.3d 361, 481 N.E.2d 613

(1985),[5] the mother of the Holcomb children did not have any contact with the children after June 1981 because she had no way to contact them. Her only attempts to find the children after that time were driving around in neighborhoods where they were believed to be living and trying to follow father home from work. The adoption petition was filed in August 1982. Consequently, the *Holcomb* holding that justifiable cause was demonstrated for lack of communication with the children had to be related to events justifying the lack of contact that preceded the one-year statutory time period. The *Holcomb* holding that mother had justifiable cause was supported by a three-year "protracted game of avoidance," characterized by the lower court as "hide and seek," *Id.* at 362. We also agree with the conclusion of the Fifth District that "[a] probate court may examine any preceding events that may have a bearing on the parent's failure to communicate with the child, and the court is not restricted to focusing solely on events occurring during the statutory one year period." *In re Adoption of K.O.D.K.*, 5th Dist. Ashland No. 15-COA-039, 2016-Ohio-1003, ¶ 27, citing *In re Adoption of L.R.K.*, 5th Dist. Muskingum No. CT2014-0040, 2015-Ohio-747, citing *In re Adoption of Lauck*, 82 Ohio App.3d 348, 612 N.E.2d 459 (9th Dist.1992). Therefore, we conclude that justifiable cause may be demonstrated by events either before or during the one year prior to the filing of the petition or a combination of both.

{¶ 16} In Father's brief and at oral argument, Father's counsel contended that the circumstances here are similar to our case of *In re S.B.D.*, 2d Dist. Miami No. 2006-CA-25, 2006-Ohio-5133, where we reversed the trial court's conclusion that the lack of

---

[5]    *Holcomb* was actually a consolidated case of separate unrelated adoptions from different counties with different surnames which were consolidated because of similarity of issues. Our references here are regarding the Holcomb adoption petition.

justifiable cause had not been proven by the adoption petitioner. We believe the facts of that case distinguish it from this one. In that case, there was a "continuous" seven-year history of "[l]egal proceedings involving custody, visitation, and child support issues" and a history of "not being able to resolve issues between themselves." *Id.* at ¶ 6. A magistrate noted "the tumultuous relationship of the parties" that required supervised visitation exchanges. *Id.* at ¶ 9. Furthermore, Father "unilaterally" terminated court-ordered visitation. *Id.* at ¶ 25. He also moved without providing his new address. Mother called father numerous times from her phone but, if he recognized the call, he would not answer. If she called from an unknown number "he would deny visits or any contact and would cuss her out." *Id.* at ¶ 21. In that case, Mother at least initiated sporadic efforts to have contact with or to visit with her children.

{¶ 17} In contrast, here there was no court-ordered visitation that was violated. When Mother moved to Columbus, she was not hiding; she maintained contact between paternal grandmother and the children, and, through that connection, with Father. There was evidence that Father and paternal grandmother knew of maternal grandmother's phone number and address, where Mother and the children were living. Although Mother eventually moved from maternal grandmother's residence, she submitted a postal change of address. There was no court-ordered visitation, or even a telephone-contact order, that was unilaterally violated. And, there was a pattern of Father's ambivalence and lack of individual effort to have contact with the children, other than as initiated by or facilitated by paternal grandmother, or as initiated by Mother's reaching out to Father in the March 2017 email exchange. Accordingly, the analysis or result of *In re S.B.D.* is not controlling.

{¶ 18} Based on our review, the trial court's findings and ultimate conclusions were supported by the evidence. We are unable to conclude that the trial court "lost its way" and created a "manifest miscarriage of justice." The Ohio Supreme Court has held that "[s]ignificant interference by a custodial parent with communication between the non-custodial parent and the child, or significant discouragement of such communication, is required to establish justifiable cause for the non-custodial parent's failure to communicate with the child." *Holcomb*, 18 Ohio St.3d 361, 481 N.E.2d 613, at paragraph three of the syllabus. Nevertheless, the Ohio Supreme Court has refused to ascribe a "precise and inflexible meaning" to "justifiable cause." *Id.* at 367. "[T]he better-reasoned approach would be to leave to the probate court as finder of fact the question of whether or not justifiable cause exists." (Citation omitted.) *Id.* In this case, there was evidence from which the trial could have concluded by clear and convincing evidence that Father's efforts to maintain contact with and to support his children at any relevant time were minimal at best, and non-existent at worst. The key determination was whether the continuing failures to maintain contact with and to support the children after March 2017 were justified in light of what we view as minimal discouragement attributable to Mother. We think the trial court did not err by determining there was a lack of justifiable cause. Father did virtually nothing. He simply quit.

{¶ 19} After reviewing the record and weighing all the evidence and reasonable inferences, we conclude that the trial court's finding that Stepfather had established, by clear and convincing evidence, that Father's failure to contact his children or to provide maintenance and support for them was without justifiable cause was supported by the evidence. The trial court did not err in holding that Father's consent to the adoption was

not required.

{¶ 20} Father's assignment of error is overruled. The judgment of the Montgomery County Probate Court is affirmed.

. . . . . . . . . . . .

TUCKER, P.J. and FROELICH, J., concur.

Copies sent to:

Jon Paul Rion
Catherine H. Breault
Cynthia Westwood
Hon. Alice O. McCollum